IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DONNELL LAVERNT ROBINSON,

    Petitioner,

vs.

RICHARD J. KIRKLAND,[1]

    Respondent.

No. 1:05-CV-01165 ALA HC

ORDER

Pending before the Court are Donnell Lavernt Robinson, Jr.'s ("Petitioner") application for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254 (doc. 1), Respondent's Answer (doc. 15), and Petitioner's Reply, which he labeled "Traverse" (doc. 23). For the reasons discussed below, Petitioner's application is denied.

I

On October 26, 2001, a Kern County Superior Court jury convicted Petitioner of second degree murder for the killing of Clifford Edison, Jr., conspiracy to commit first

---

[1] A petition for 28 U.S.C. § 2254 relief "must name 'the state officer having custody of him or her as the respondent to the petition.'" *Smith v. Idaho*, 392 F.3d 350, 354 (9th Cir. 2004) (citations omitted). Lee Ann Chrones is substituted as the respondent in this case, replacing Richard Kirkland, as Chrones is the warden of the prison in which Petitioner is incarcerated.

1

degree murder, and assault with a firearm on Wynnessa Lane. The jury also found that Petitioner personally used a firearm during each crime. He was sentenced to twenty-five years to life for the conspiracy charge, and a consecutive ten year term for the enhancement; as to the second degree murder charge, he was sentenced to fifteen years to life, along with a consecutive ten year term for the enhancement; as to the assault with a firearm charge, he was sentenced to four years, with a consecutive five year term for the enhancement. The sentences relating to the second degree murder and assault convictions, along with the corresponding enhancement sentences, were stayed.

Petitioner appealed. The California Court of Appeal's Fifth Appellate District summarized the underlying facts of Petitioner's crimes as follows:[2]

> At approximately 2:30 p.m. on May 30, 2001, Clifford Edison, Jr. and his girlfriend, Wynnessa Lane, were at their house on South Chester in Bakersfield when they heard a knock on the door. Lane was in the bathroom and Edison called out that he wondered who was there. Edison began to open the door but it flew open, and five men with guns "busted in." The men had masks and bandanas over their faces. [¶] Lane testified that four gunmen attacked Edison, and punched and kicked him. One of the men beating Edison held an unusual gun, which was small, appeared to have two handles, and had a chrome tip. Lane testified the fifth man held a gun to her head, told her to sit on the floor, and did not hit her. Lane testified this gunman didn't act as forceful or violent as the men who were beating Edison, and he almost seemed to be pleading with her to cooperate and get on the floor. He was wearing a ski mask with a hole near the nose, but Lane could still see the man's eyes, nose, eyebrows, and mustache hairs. Lane could also see the bumps of the man's French braids. He was wearing a white T-shirt and gray shorts below the knees, "with that shiny kind of metallic look to them." Lane testified the man's voice and eyes were familiar to her. She also recognized his whole style, what he wore, and how he talked, and realized he was [Petitioner] Donnell "Domino" Robinson. Lane didn't know [Petitioner] on a personal basis but had met him through other people. Lane testified [Petitioner] had been to their house on several occasions to see Edison. [¶] Lane testified the other men continued to yell, scream, and beat Edison, and she pleaded with them to stop.

---

[2] This Court's version of the California Court of Appeal's facts are taken from Respondent's Answer. *See* Answer at 6-10. They vary from the Court of Appeal's summary of the facts only in that they have been condensed for space purposes. None of the content has changed.

2

As a result of her pleas, one gunman left Edison and told Lane that she would be shot if she didn't shut up. Lane testified she heard a pop, and the gunmen started to run from the house. One gunman paused as if he was going to shoot Lane, but this person also fled. Lane locked the doors and ran to Edison, and realized he had been shot in the head. She put pressure on the gunshot wound to stop the bleeding. She also tried to help him breathe but believed he was already dead. [¶] Lane called 911 and told the dispatcher that men had broken into her house, shot her boyfriend in the head, and he was bleeding to death. The police arrived within five minutes. Lane testified she spoke to the police a few hours after the shooting and gave them a description of [Petitioner]. [¶] Detective Robert Heiduk responded to Edison's residence and found his body in the kitchen. Edison had suffered a gunshot wound in the head. There was an expended nine-millimeter casing on the floor, just to the right of the body. The expended casing was a CCI brand, which was aluminum or white metal in color. [¶] The officers who initially arrived at the scene briefly interviewed Wynnessa Lane and received a description of the suspects. Around 4:30 p.m., Detective Heiduk interviewed Lane at the police department. Lane said she thought the person who pleaded with her to get on the floor knew her by the way he acted toward her. Lane told Detective Heiduk about the distinctive weapon used by one of the assailants, and that it had two handles with a chrome tip on the muzzle. Detective Heiduk testified her description of the weapon was consistent with an Intratec Arms Tec-9 nine-millimeter assault pistol, which uses nine-millimeter ammunition and had been used in several shootings in the Bakersfield area. [¶] Edison was killed by a single gunshot wound in the head which had been fired at close range. The bullet entered the left side of his head, above the ear and behind the eyebrow, and went through the skull. The bullet traveled in a downward direction, from left to right and front to back. There were bruises around his eyes which were caused by the gunshot wound. There were no obvious punch or kick marks on Edison's face or body, but the pathologist testified a body is not likely to bruise after the heart stops. [¶] The police found approximately $14,000 in cash hidden in Edison's house. Edison's sister and Wynnessa Lane told the police the money was obtained from a real estate loan. There was no evidence that the gunmen tried to steal the money. Detective Heiduk found a spiral notebook in the house, with a page entitled "People that owe me." The page contained a list of names and numbers. The name "Domino" was written on the page, along with an equal sign and "$5." There were other names written on the page, along with amounts of $5, $10, and $25. [¶] Mark Ferguson lived on the corner of La France and El Soreno Drive, directly behind the residences on South Chester Street. At approximately 2:30 p.m. on May 30, he saw three or four young men walking toward the houses on South Chester. About five minutes later, Ferguson saw these same individuals jogging and running back. He noticed one of the men was wearing a pair of light blue basketball-type shorts, possibly "North Carolina blue." Ferguson testified one of the men had "a hand around his waist, as if

he was carrying something." [¶] Ferguson testified the men entered an early 1990's model light blue Cadillac with a felt material top. The car was facing south on El Soreno Drive. Ferguson did not see their faces, but he observed at least two men take off ski masks as they entered the car. Ferguson continued to watch as the car headed eastbound on La France, and he was able to get part of the license plate number. The first two figures were "4" and "N." The next figure was a "swooping" letter, like a "J" or "G." Ferguson did not call the police, but he saw police in the area about one hour after seeing the men leave in the Cadillac. [¶] Josea Kent testified that [Petitioner] Donnell "Domino" Robinson came by his house around noon on May 30, 2001, and asked to borrow Kent's blue Cadillac. [Petitioner] was alone and talked with Kent at the door. [Petitioner] didn't say why he wanted to borrow the car, but promised to return it later. [Petitioner] had never borrowed his car before but Kent wasn't worried about it. Kent gave the keys to [Petitioner] and he left by himself. [¶] Kent testified he went outside around 6:00 p.m. and found his car parked in the garage. Kent testified it was unusual to see his car in the garage because he normally parked it in the driveway. The keys were not in the car and Kent did not see [Petitioner]. [¶] Detective Heiduk testified the police department received several anonymous telephone calls that "Domino," "Little Cool," and Josea Kent were involved in the murder, and that "Domino" was at 1st and T Streets. At 4:30 p.m. on May 30, Officer Matthew Peery observed a white, 1997 Cadillac at the intersection of 1st and T Streets which was completely blocking traffic, and conducted a traffic stop. Tommie Thomas was the driver and [Petitioner] was the passenger. [Petitioner] was wearing a white T-shirt and long gray shorts, which were "new nylon shorts, real shiny." Officer Peery asked [Petitioner] what he had been doing that day, and [Petitioner] said he was playing basketball at Lowell Park for the previous two hours. Officer Peery was aware that [Petitioner] was possibly involved in the murder of Edison. Officer Peery determined Thomas was on active probation and conducted a probation search of the car, did not find any contraband, and allowed [Petitioner] and Thomas to leave. [¶] Later that evening, Josea Kent visited his girlfriend, Antwanique "Nikky" Walker, at her apartment on White Lane. Shortly before 11:00 p.m., [Petitioner] and Tommie Thomas arrived at Nikky's apartment as Kent and Nikky were about to watch the news. Kent didn't know why they were there, but figured [Petitioner] was probably looking for him and knew he could find Kent at Nikky's place. Kent testified they watched the news and there was a story that [Petitioner] and Tommie "Little Cool" Thomas were suspects in a murder investigation. Kent testified that [Petitioner] started to talk about calling "the lawyer or something before they like got in trouble, before anything happened, before they got arrested or something like that." Kent didn't ask [Petitioner] anything about the news story or murder. However, [Petitioner] gave Kent a black box and told Kent to "[g]o put it up," which meant to "go hide it or something like that." Kent testified he opened the box and saw some bullets inside, and he put the box in his bedroom

closet. [¶] Detective Heiduk testified he spoke again with Lane between 6:00 p.m. and 7:00 p.m., and she said the gunman who pleaded with her to get down went by the nickname "Domino." Heiduk knew a subject named "Domino" who had a distinct injury to his right hand. He asked Lane if she knew about such an injury in order to confirm her identification. Lane replied Domino lost some fingers when a pipe bomb exploded in his hand. However, Lane never said the gunman next to her was missing any fingers or had a crippled hand. Lane initially described this person as wearing shiny gray jeans, but during this interview she referred to this person's clothes as shorts. [¶] In the early morning hours of May 31, 2001, Officer Matthew Eastman and several officers from the special enforcement unit responded to Nikky Walker's apartment and arrested [Petitioner], Tommie Thomas, and Josea Kent. Nikky Walker was also taken into custody. Officer Eastman searched the apartment and found an empty Tec-9 plastic gun case on the floor of the closet in the master bedroom. He also found a box of CCI nine-millimeter live ammunition on the top shelf of the closet, behind some shoeboxes. The casings were brass colored. [Appellate court's footnote number three copied and placed under Respondent's footnote number seven.7/] [¶] At 2:30 a.m., Detective Heiduk interviewed [Petitioner] at the police department and advised him of the Miranda [Appellate court's footnote number four copied and placed under respondent's footnote number eight.8/] warnings. [Petitioner] was wearing a white T-shirt and three-quarter length, shiny gray shorts when he was arrested. [Petitioner] agreed to answer questions about his activities the previous day, and said he went to court around noon to take care of a traffic ticket. At 12:30 p.m., he returned to his residence and took a nap. At 1:30 p.m., he went to his friend Edward's house, where he lifted weights. He left around 2:30 p.m. and met Tommie "Little Cool" Thomas near T and 1st Streets. [Petitioner] was using his girlfriend's white Cadillac. They picked up Ebony Ward, Thomas's girlfriend, and drove to Ward's house in the Olive Drive area, where Ebony braided [Petitioner's] hair. They went to Thomas's house and used Thomas's car to drive to Nikky Walker's house, where they stayed the rest of the evening until the police arrived. [¶] Heiduk asked [Petitioner] why his name was written in the notebook found in Edison's house, and why he owed $5 to Edison. [Petitioner] replied he previously purchased a cheap car stereo from Edison. [Petitioner] never told Detective Heiduk that he played basketball for two hours in the afternoon, as he told Officer Peery during the traffic stop. [¶] After Detective Heiduk finished speaking with [Petitioner], he interviewed Josea Kent, who had also been arrested. Kent was advised of the Miranda warnings and agreed to answer questions, and said he was with his girlfriend most of the day and ran errands. Detective Heiduk then interviewed Nikky Walker and another suspect. [¶] At 4:30 a.m., Detective Heiduk was about to leave the police department when he was informed that Josea Kent wanted to speak with him again. Heiduk conducted another interview with Kent, and Kent told him that he loaned his blue Cadillac to [Petitioner] and [Petitioner] later gave

him the box of bullets. Heiduk testified he did not make any promises or offers of leniency to Kent in exchange for his statement. [¶] At trial, Kent testified he initially lied to the police about his contact with [Petitioner] and the Tec-9 box because he didn't want to be a snitch. Kent testified he subsequently told the truth about loaning his car to [Petitioner], seeing him later in the evening, and hiding the black box for him. Kent also told the police that his car was parked in his garage.

**Defense Evidence**

[Petitioner] was the only defense witness, and testified he was 24 years old and received disability because he lost four fingers when a cherry bomb exploded in his hand in 1994. He lived on T Street in Bakersfield with his wife and children, and drove a white 1977 Cadillac Coupe deVille. On the morning of May 30, he took his children to school. At noon, he went to court for a traffic matter. [Petitioner] testified he left the courthouse around 12:15 p.m. and went home to take a nap. He woke up around 1:30 p.m. and went to Edward's house at 1st and T Streets, where he lifted weights until 2:15 p.m. Tommie Thomas arrived at Edward's house, and [Petitioner] and Thomas left in [Petitioner]'s car. They drove around and saw Thomas's girlfriend, Ebony Ward. Ward was with two friends, Devon Brown and a girl named "Tracie." [Petitioner] and Thomas gave Ward and her friends a ride to Ward's house, where they watched a basketball game on television while Ward braided [Petitioner]'s hair. [¶] [Petitioner] and Thomas were leaving Ward's house in the white Cadillac when Officer Peery conducted the traffic stop on 1st and T Streets. [Petitioner] told Peery he had been at Ward's house. [Petitioner] testified he never told Peery that he was playing basketball that day. [Petitioner] believed Peery saw him playing basketball at the park on previous occasions and made a mistake. [Petitioner] and Thomas asked why they were detained and Peery said their car blocked the roadway. [Petitioner] testified the car was actually parked in the driveway and didn't block the street. [Petitioner] thought they were detained for about 30 minutes. [¶] [Petitioner] testified the officer released them and they drove around the area. Thomas later received a call from Josea Kent, who asked him to come to Nikky Walker's apartment because Kent needed a ride to the bus station. They went to Nikky's apartment and Kent again asked for a ride to the bus station. They sat around and talked, and also watched the late news. [Petitioner] and Thomas heard their names on the news. [Petitioner] testified that he knew he didn't do anything, "and I know that my name was on the news for nothing. So I was like I want to call a lawyer, I'm saying talk to a lawyer first before I turn myself in." [Petitioner] testified the police arrived about an hour later and arrested them. [¶] [Petitioner] testified he had seen Clifford Edison "off and on, but we never did have no personal relationship, and the only time that I seen him was when I bought the car stereo from him." [Petitioner] testified he went to VASR Stereo and Audio Signs on Ming Street to get his car stereo hooked up, but

6

> the salesman told him the wires were burned and it couldn't be used. The salesman also said that he knew a guy who wanted to sell a car stereo, and the salesman contacted Clifford Edison. [Petitioner] met Edison at the store and bought a car stereo from him for $70. [Petitioner] testified he still owed $5 to Edison for the stereo, which was why his name was written in Edison's notebook. [Petitioner] testified he never had a dispute with Edison about the stereo or anything else. [¶] [Petitioner] testified he knew he had been arrested for the murder of Clifford Edison when Detective Heiduk interviewed him. [Petitioner] told Detective Heiduk he owed $5 to Edison for a cheap car stereo, and that's why his name was in Edison's notebook. [Petitioner] admitted he never told Heiduk that he actually purchased the stereo for $70 and already paid $65 for it, but Heiduk never asked him. [¶] [Petitioner] testified Tommie Thomas was 19 years told and lived in Las Vegas, where he was training to be a boxer. [Petitioner] testified Thomas was a good friend who could back up his story, but he didn't know why Thomas wasn't at the trial. [Petitioner] testified Ebony Ward was incarcerated in Las Vegas. He didn't know how to contact Ebony Ward's friends, Devon Brown and Tracie, or his friend Edward. [¶] [Petitioner] testified he knew Josea Kent about six months before he was arrested. [Petitioner] had just seen Kent around and didn't have a relationship with him. [Petitioner] had been in Kent's blue Cadillac on one occasion, which was three days before he was arrested. Kent drove to the park and [Petitioner] sat in the car to smoke a cigarette. [Petitioner] never borrowed or drove the blue Cadillac. [¶] [Petitioner] disputed Wynnessa Lane's testimony that he often visited Edison at their house. [Petitioner] testified he had seen Lane when she danced at clubs, but he never had a conversation with her. [Petitioner] had never owned a Tec-9 pistol, or any other guns or ammunition. [¶] On redirect examination, the prosecutor recalled Wynnessa Lane, who testified there was approximately $14,000 in cash hidden in their house when Clifford Edison was murdered. Lane testified they received the money from a loan on their house, and she was the only person who knew where it was hidden. Lane testified none of the masked gunmen demanded money or any valuables as they beat Edison. "They just attacked him."

The California Court of Appeal reversed Petitioner's conspiracy conviction. The remaining convictions were affirmed. The case was remanded for resentencing. Petitioner was subsequently resentenced to one term of fourteen years and another term of fifteen years to life. Petitioner appealed that sentence, and his appeal was dismissed. Petitioner then petitioned for review in the California Supreme Court. His petition in that court was denied.

On February 13, 2003, Petitioner filed a petition for writ of habeas corpus in the

Kern County Superior Court. The petition was denied on March 17, 2003. In denying the petition, the court rejected Petitioner's claim that he received ineffective assistance of counsel because "Petitioner did not meet his burden of showing prejudice." Lodged Doc. 10. In particular, the court noted that Petitioner did not show that the evidence he claimed his counsel should have introduced might have affected the verdict.

On April 24, 2003, Petitioner filed a habeas petition in the California Court of Appeal's Fifth Appellate District. That court denied the petition without comment on May 22, 2003. On August 11, 2004, Petitioner filed an application for habeas corpus relief in the California Supreme Court. The petition was summarily denied on June 29, 2005. In assessing Petitioner's entitlement to habeas relief, this Court reviews the Superior Court's order. *See Franklin v. Johnson*, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002) (explaining that when a subsequent appeal is denied without comment, a federal court must look to the last state court decision to actually address a claim).

II

An application for a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "shall not be granted with respect to any claim that was adjudicated on the merits" in state court unless the adjudication of the claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Petitioner's federal habeas petition raises several claims for relief. First, he contends that his trial counsel was ineffective for failing to call "'Deputy Lopez' as a[n] alibi witness." Petition at 5. Next, he claims that a photo taken of him at a traffic stop

1  rendered his trial unfair.  Third, he argues that it was error for the trial court to refuse to
2  instruct the jury that "if they had a reasonable [d]oubt as to whether the offense charged
3  in count 1 was murder or manslaughter, that they were obliged to give [Petitioner] the
4  benefit of that [d]oubt." *Id.* at 6.  Fourth, Petitioner alleges that his conspiracy conviction
5  "must be reversed" because "the [j]ury was never instructed that conspiracy to commit
6  murder required the specific intent to kill, and the instructions allowed the [j]ury to
7  convict based on an implied malice theory." *Id.*  In a related claim, he asserts that he was
8  convicted of second degree murder based on a theory that does not match the facts of his
9  case.

A

In arguing that his trial counsel was ineffective, Petitioner claims that counsel should have called Deputy Lopez of the Kern County Sheriff's office as an alibi witness at trial.  Petitioner contends that Lopez would have testified that he saw Petitioner at the home of Ebony Edwards at the time the murder was committed, thereby proving that because Petitioner was not at the scene of the crime when it was committed, he was not guilty of the murder.

Petitioner's entitlement to habeas relief on this ground "turns on showing that the state court's resolution of his claim of ineffective assistance of counsel" under *Strickland v. Washington*, 466 U.S. 668 (1984), "'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting 28 U.S.C. § 2254(d)(1)).  "Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice." *Id.*  "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the

outcome.'" *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (citation omitted). "Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other." *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002).

In *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000), a habeas petitioner argued that his trial counsel was not adequately prepared because he "agreed to represent Dows at trial after only three days of preparation, did not interview any witnesses or conduct an investigation, and did not contact a possible alibi witness as suggested by Dows." Each of these arguments were found to be meritless. The Court noted that

> as to [trial counsel's] failure to interview or call an alleged alibi witness, there is no evidence in the record that this witness actually exists, other than from Dows's self-serving affidavit. Moreover, Dows provides no evidence that this witness would have provided helpful testimony for the defense - i.e., Dows has not presented an affidavit from this alleged witness.

*Id.* at 486. As a result, the Court upheld the district court's conclusion that the petitioner "did not provide sufficient evidence of [his trial counsel's] lack of preparation to prove that [his trial counsel] was 'ineffective' under *Strickland*." *Id.* at 486-87.

Petitioner's allegations regarding Lopez are conclusory. As in *Dows*, Petitioner has failed to introduce an affidavit signed by Lopez that explains what Lopez's testimony would consist of. All he has alleged is some conceivable effect on the outcome of his trial. This is not sufficient. *Strickland*, 466 U.S. at 668, 693 (explaining that because "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice," it is therefore "not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding").

Respondent challenged this claim on an alternate ground, arguing that there is no evidence that Petitioner's counsel was aware of Deputy Lopez's existence. Answer at 17.

In his traverse, Petitioner contends that "[t]he attached exhibit A, clearly demonstrates that [trial counsel] was aware of Deputy Lopez being a[n] alibi witness." The exhibit consists of an application prepared by his appellate counsel on direct appeal. The application sought leave to "expand scope of Counsel's appointment to include preparation of a petition for writ of habeas corpus." It summarizes the facts justifying the leave requested, alleging that Petitioner informed his trial counsel that he was at a friend's house at the time the murder in question was committed, and that while at his friend's house, he came into contact with Deputy Lopez. It further alleges that Petitioner's trial counsel failed to investigate the existence of an alibi witness because counsel was not paid for his services.

The Court's conclusions rejecting Petitioner's ineffective assistance of counsel claim do not turn on whether counsel was aware of Deputy Lopez's identity and the testimony he would have provided. The claim fails because there is no evidence in the record that Deputy Lopez exists. The exhibit attached to Petitioner's traverse does not demonstrate that any "Deputy Lopez" was available to testify on Petitioner's behalf.

B

In his second claim for relief, Petitioner contends that there is "nothing that ties petitioner to [the underlying crime in this case]" other than the fact that Petitioner was pulled over for a traffic stop three hours after Edison's murder. Petition at 4. According to Court of Appeal's summary of the facts, at trial, Wynnessa Lane testified that one of the men who entered Edison's home was wearing "a white T-shirt and gray shorts below the knees, 'with that shiny kind of metallic look to them.'" *See* Unpublished Opinion of the California Court of Appeal's Fifth Appellate District in Case No. F039677, *People v. Robinson*, ("Court of Appeal Decision"), Lodged Item No. 3 at 401. Additional evidence at trial established that around two hours after the murder, Petitioner was pulled over for a

traffic stop, and "was wearing a white T-shirt and long gray shorts, which were 'new nylon shorts, real shiny.'" *Id*. at 404.

Petitioner alleges that when he was pulled over, police officers took Petitioner's photo. He argues that "the [o]fficers [t]ainted the [i]dentification by taking the photo at the traffic stop . . . . [b]y that means the Petitioner had an unfair TRIAL, AND THE PETITIONERS [sic] IDENTIFICATION WAS TAINTED." Petition at 8.

Respondent construes this claim as two arguments: first, that the photo taken at the traffic stop constituted an impermissibly suggestive pretrial identification; and second, that Petitioner's second degree murder conviction was not supported by sufficient evidence. However, Petitioner's petition does not assert that the photo was used in any kind of pretrial identification process. Rather, Petitioner takes issue with the fact that he was stopped for "no reason" and that the photo taken after he was stopped tainted his trial. The Court construes this as a claim that the evidence should have been suppressed because it was the result of an illegal search and seizure. A Fourth Amendment claim is not cognizable as a claim for habeas corpus relief so long as a petitioner was afforded "'full and fair litigation' of his fourth amendment claim" in his state trial. *Gordon v. Duran*, 895 F.2d 610, 613 (9th Cir. 1990) (citing *Stone v. Powell*, 428 U.S. 465, 481-82 (1976)). "Under California law, a defendant can move to suppress evidence on the basis that it was obtained in violation of the fourth amendment." *Id*. Therefore, "the Constitution does not require that [Petitioner] be granted habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id*. at 613-14.

Liberally construed, Petitioner's statement that "nothing that ties petitioner to [the underlying crime in this case]" can be interpreted as an allegation that his second degree murder conviction was not supported by sufficient evidence. A federal habeas court

reviews challenges to the sufficiency of the evidence by determining whether after "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lewis v. Jeffers*, 497 U.S. 764, 781, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990). "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson v. Virginia*, 443 U.S. 307, 324 n.16, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

Respondent's Answer does little to assist the Court in adjudicating this claim. Respondent acknowledges that "[s]ufficiency of the evidence claims . . . must be measured with reference to substantive requirements as defined by state law." Answer at 20. However, Respondent does not list the substantive requirements of the conviction Petitioner challenges.

Under California law, "[s]econd degree murder is the unlawful killing of a human being with malice aforethought, but without the premeditation, deliberation and willfulness necessary to elevate the offense to first degree murder." *People v. Bohana*, 84 Cal. App. 4th 360, 368 (Cal. App. 2d Dist. 2000). The record does not include evidence that Petitioner himself shot the murder victim. However, "'[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.'" *People v. McCoy*, 25 Cal. 4th 1111, 1116-1117 (2001). The jury was instructed as to aider and abbettor liability. Jury Instructions, Lodged Doc. 3 at 267-69.

"[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus

reus—conduct by the aider and abettor that in fact assists the achievement of the crime." *People v. Perez*, 35 Cal. 4th 1219, 1225 (2005). Although "[t]he aider and abettor must share the specific intent of the perpetrator . . . . an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." *People v. Beeman*, 35 Cal. 3d 547, 560 (1984).

Here, there is evidence that one of the five men who entered Edison's home on May 30, 2001, intentionally shot and killed Edison. In fact, the bullet that killed Edison was fired at close range. As to Petitioner's intent, before the crime, Petitioner borrowed a car that was later used to transport the five men away from the scene of the crime. He facilitated Edison's shooting by holding a gun to Wynnessa Lane's head (Lane was at home with Edison when the five men entered). The act of holding a gun to Lane's head also establishes Petitioner's actus reus. As a result, there is sufficient evidence to establish that Petitioner was guilty of aiding and abetting Edison's murder.

C

Petitioner's third claim, that the trial court erred in failing to give the jury a "Dewberry" instruction is an argument that the trial court was required to instruct the jury according to the rule announced in *People v. Dewberry*, 51 Cal. 2d 548 (1959). In *Dewberry*, the California Supreme Court held that "when the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense, the jury must be instructed that if they entertain a reasonable doubt as to which offense has been committed, they must find the defendant guilty only of the lesser offense." *Id*. at 555. Pursuant to California law, "in any case involving a lesser included offense, the trial court has a duty to give a *Dewberry* instruction sua sponte." *People v. Crone*, 54 Cal. App. 4th 71, 76 (Cal. App. 4th Dist. 1997).


Whether it was error to not give a *Dewberry* instruction is a question of California law beyond the scope of the Court's review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

### D

In his fourth claim, Petitioner contends that his conspiracy conviction must be reversed. His conspiracy conviction *was* reversed. *See* Court of Appeal Decision, Lodged Item No. 3 at 440 ("Appellant's conviction in count II for conspiracy to commit murder is reversed."). Therefore, this claim is denied as moot.

Petitioner's argument regarding his conspiracy conviction stretches over two pages, and includes the contention that "[t]here was no sufficient cause to sustain a conviction after the JURY already [a]cquitted the Petitioner on murder . . . the prosecutor did not prove every element of the charge[d] crime of murder and of conspiracy to commit murder." Petition at 10. Petitioner further argues that he is entitled to relief on this ground "under CALIFORNIA LAW of FAILURE TO DUE PROCESS." *Id.* Respondent construes this claim as an argument regarding the sufficiency of the evidence supporting Petitioner's second degree murder conviction. Answer at 25.

However, in his traverse, petitioner explains the kind of relief he seeks with this claim. He argues that he could only have been convicted of second-degree murder on one of two theories: first, on the basis that he possessed the intent to kill; and second, that he was found guilty of second degree felony murder, with the conspiracy charge serving as the underlying felony. He contends that because the jury found him not guilty of first degree murder, they consequently found that he lacked the intent to kill. Also, he alleges that because the conspiracy conviction was reversed, no underlying felony supports a

1 felony second degree murder conviction. This is not a sufficiency of the evidence claim.
2 Petitioner argues that California allows for second degree murder convictions on only two
3 theories. Because neither theory is supported by the procedural history of his case,
4 Petitioner concludes that he should not have been convicted of second degree murder.
5      Before addressing the merits of this claim, the Court notes that Petitioner did not
6 present this claim to the California Supreme Court in his petition for habeas review before
7 that court. To exhaust a claim, a federal habeas petitioner must present the claim to the
8 state's highest court, even if the highest court's review is discretionary. *O'Sullivan v.*
9 *Boerckel*, 526 U.S. 838, 840 (1999). "California's 'established, normal appellate review
10 procedure is a two-tiered system;'" therefore, petitioners are required to exhaust their
11 habeas claims in petitions for review in the California Supreme Court. *Gatlin v.*
12 *Madding*, 189 F.3d 882, 888 (9th Cir. 1999). As a result, Petitioner's claim is
13 unexhausted, and the petition before us is mixed. *See Rhines v. Weber*, 544 U.S. 269, 271
14 (2005) (explaining that a mixed petition is one in which "a state prisoner presents a
15 federal court with a single petition containing some claims that have been exhausted in
16 the state courts and some that have not").
17      When a district court is presented with a petition containing both exhausted and
18 unexhausted claims, it has authority to "stay the petition and hold it in abeyance while the
19 petitioner returns to state court to exhaust his previously unexhausted claims." *Id*. at 275.
20 The stay is lifted "[o]nce the petitioner exhausts his state remedies." *Id*. at 275-76.
21 However, "granting a stay effectively excuses a petitioner's failure to present his claims
22 first to the state courts." *Id*. at 277. A district court abuses its discretion if it grants a stay
23 when "unexhausted claims are plainly meritless." *Id*.
24      "[I]f a petitioner presents a district court with a mixed petition and the court
25 determines that stay and abeyance is inappropriate, the court should allow the petitioner
26 to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of

16

the entire petition would unreasonably impair the petitioner's right to obtain federal relief." *Rhines*, 544 U.S. at 278.  Yet AEDPA "amended 28 U.S.C. § 2254 to include a provision that allows a district court to dismiss a habeas petition on the merits, notwithstanding a petitioner's failure to exhaust." *Jackson v. Roe*, 425 F.3d 654, 658 n.5 (9th Cir. 2005) (citing 28 U.S.C. § 2254(b)(2)).  "After AEDPA then, a district court can dismiss a mixed petition on the merits but may not grant relief unless and until all the claims therein have been exhausted in state court." *Id.*  A court may deny an unexhausted claim on the merits pursuant to section 2254(b)(2) "only when it is perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).

Petitioner does not raise a colorable federal claim.  Rather, Petitioner misunderstands the possible theories that support a second degree murder conviction under California law.  "California law . . . recognizes three theories of second degree murder . . . unpremeditated murder with express malice . . . . implied malice murder . . . . [and] second degree felony murder." *People v. Swain*, 12 Cal. 4th 593, 601 (1996).  The Court of Appeal explained that "second degree felony murder . . . is not at issue in this case."  Court of Appeal Decision, Lodged Item No. 3 at 425.

The jury acquitted Petitioner of first degree murder, but found him guilty of second degree murder.  Jury Verdict, Lodged Item No. 2 at 346-47.  Under California law, the difference between first and second degree murder is not that one requires an intent to kill, and one does not.  "Second degree murder is the unlawful killing of a human being with malice aforethought, but without the premeditation, deliberation and willfulness necessary to elevate the offense to first degree murder." *People v. Bohana*, 84 Cal. App. 4th 360, 368 (Cal. App. 2d Dist. 2000).  Second degree murder may be proved through an express malice theory, which requires an intent to kill.  *Id.*  Under an implied malice theory of second degree murder, there is no intent to kill, but rather, "the specific intent to

do some act dangerous to human life together with the circumstance that a killing has resulted from the doing of such act." *Swain*, 12 Cal. 4th at 603. The jury was instructed as to both express and implied malice second degree murder. Jury Instructions, Lodged Item No. 3 at 289-90.

The Court rejects Petitioner's contention that he could not have been convicted of second degree murder. Although the jury found him not guilty of first degree murder, that finding did not necessarily mean that it also found that he lacked the intent to kill, as second degree express malice murder requires an intent to kill. Also, Petitioner has not established that his second degree murder conviction was for felony second degree murder. Petitioner could have been convicted of second degree on a theory of either express or implied malice. Both of those theories are recognized under California law.[3]

Each of Petitioner's claims fail. Therefore, the state court's denial of his petition for habeas corpus was not "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

---

[3] Petitioner's traverse also includes the claim that his second degree murder conviction violates the Double Jeopardy Clause. This claim is absent from his petition, and therefore cannot be considered. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for relief [because] [i]n order for the State to be properly advised of additional claims, they should be presented in an amended petition or . . . in a statement of additional grounds. Then the State can answer and the action can proceed."). *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).

**Accordingly, IT IS HEREBY ORDERED that**:

1. The application for a writ of habeas corpus (doc. 1) is DENIED.

2. The Clerk of Court is DIRECTED to enter judgment in favor of the Respondent and close the case.

DATED: August 11, 2008

/s/ Arthur L. Alarcón
UNITED STATES CIRCUIT JUDGE
Sitting by Designation